50 F.3d 285
 63 USLW 2671
 Jamie B. BROWN, Plaintiff-Appellant,
v.
David W. WADDELL, both individually and in his official
capacity as a police officer for the City of
Durham; City of Durham, North Carolina,
Defendants-Appellees.
 No. 93-1729.
 United States Court of Appeals,
Fourth Circuit.
 Argued Feb. 7, 1994.
Decided March 30, 1995.
 
 ARGUED: Mark Alexander Charns, Duvoisin & Charns, Durham, NC, for appellant. Reginald B. Gillespie, Jr., Faison & Fletcher, Durham, NC, for appellees. ON BRIEF: William G. Goldston, Durham, NC, for appellant. Michael R. Ortiz, Faison & Fletcher, Durham, NC, for appellees.
 Before BUTZNER and PHILLIPS, Senior Circuit Judges, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.
 Vacated and remanded by published opinion. Senior Judge PHILLIPS wrote the opinion, in which Senior Judge BUTZNER and Senior Judge YOUNG joined.
 OPINION
 PHILLIPS, Senior Circuit Judge:
 
 
 1
 This appeal requires us to determine whether, for purposes of the Federal Electronic Communications Privacy Act of 1986 (ECPA) and relevant state law, a "pager clone" such as two used by a law enforcement officer to monitor numeric messages received by a suspect's digital display pager in this case is effectively a "pen register." If it is, the procedures followed to authorize the use here were legally proper; if it is not, the procedures were not proper and the use was unauthorized. The district court held that the pager clone was effectively a pen register so that its use had been properly authorized, and on that basis dismissed by summary judgment the suspect's statutory action seeking monetary and injunctive relief for allegedly unauthorized use of the device. We hold to the contrary that a "pager clone" such as that used in this case is not a pen register and that its use here was therefore unauthorized. Accordingly, we vacate the district court's judgment and remand for further proceedings.
 
 
 2
 * In late October, 1991, David W. Waddell, a member of the Durham, North Carolina, police force assigned to the Major Crimes Unit of its Organized Crime Division, was directed by his superiors to investigate the possibility that Jamie B. Brown, then a telecommunicator in the Department, was engaged in drug trafficking activities. The suspicion of such a possibility purportedly was then based in part on information obtained by the authorized installation on Brown's two home telephone lines of a "trap and trace" device, which had revealed the numbers assigned to telephones from which incoming calls to Brown's number originated.
 
 
 3
 In addition to one cellular and two home telephones, Brown also then possessed, under lease from Carolina Paging, Inc., two digital display pagers with separate telephone numbers assigned to each. Both pagers were numeric only; they could receive and display only numbers and dashes, and they had no transmission capability. Although the basic intended function of these pagers was to receive telephone numbers that were then to be called by the pager custodian, they could actually receive and display combinations of up to 24 (or 25) numbers and dashes in a single transmission. Transmission to such a pager of any set of numbers and dashes up to that total could be accomplished by a caller's punching the numbers into a telephone key pad, from which point they would be transmitted by telephone line into the paging service's facilities from where, following processing, they would be further transmitted by radio waves to the pager for display on its screen.
 
 
 4
 To investigate a suspicion by Department officials that Brown was using her pagers to communicate with drug traffickers, Waddell was instructed to obtain legal authorization to use a "pager clone" to monitor the numeric messages being received on those pagers. To do so, he prepared an affidavit, application, and order in the form appropriate under the ECPA and state law for obtaining authorization to install a pen register or trap and trace device. Specifically, Waddell's application, which was presented to a state superior court judge, requested "[t]hat the Court authorize the installation of a pen register type system known as a 'Group Call' by the Durham Police Department on the pager service of Jamie Brown which is known as 598-2086 and 598-2065." J.A. 196.
 
 
 5
 The state court judge granted the application, and authorized the installation of a "pen register" for a period of 90 days. In issuing the order, the court stated:
 
 
 6
 The installation of a PEN register on the pager service of this individual by law enforcement officers in furtherance of this investigation is constitutionally permissible under Smith v. Maryland, 442 U.S. 735 (1979), and the installation of such by law enforcement officers is authorized by United States v. New York Telephone Company, 434 U.S. 159 [ 98 S.Ct. 364, 54 L.Ed.2d 376 ] (1977).
 
 
 7
 On the day Waddell received the authorizing order, he used it to obtain from Carolina Paging, Inc. two pagers programmed identically to the two pagers assigned to Brown. This "cloning" of Brown's pagers allowed Waddell to receive any numeric messages sent to Brown's pagers at the same time that they were received and displayed on her pagers. At this time, Waddell also requested and obtained from Carolina Paging, Inc. Brown's twenty most recent pagings, ten for each pager number, that were temporarily stored in the company's electronic storage bank.
 
 
 8
 Waddell's monitoring of Brown's pagers lasted less than a month. During that time, he received on his clone pagers a great number of separately transmitted sets of numbers and dashes that were being received simultaneously on Brown's pagers. Waddell prepared a log showing each numeric message received, and the date and time each was received. While the sole original purpose of all this, according to Waddell, was to obtain the telephone numbers of the persons paging Brown, it is undisputed that Waddell intercepted a number of numeric messages containing more extensive sets of numbers than those in telephone numbers, including at least one that was conceded to be a code indicating that a caller which it identified was "en route." Sealed J.A. 314.
 
 
 9
 On December 19, 1991, Waddell returned the two pager clones to Carolina Paging. No charge resulting from this particular departmental investigation was brought against Brown, and in January, 1992, she received from the Chief of Police a letter of "official apology." It stated, in part, that "The Division failed to meet the high standards of professionalism in your case ... corrective action will be taken to insure that incidents of this nature will not occur in the future." J.A. 55.
 
 
 10
 Shortly thereafter, Brown brought this action under the private action provision, 18 U.S.C. Sec. 2520(a), of the ECPA, seeking monetary and injunctive relief against Waddell in his individual and official capacities and against the City of Durham. In an amended complaint, she alleged three violations of her rights under the ECPA by virtue of the defendants' conduct: (1) a violation of 18 U.S.C. Sec. 2511 by the unauthorized interception, use, and disclosure of her electronic communications through use of the pager clones; (2) a violation of 18 U.S.C. Sec. 2511 by the interception, use, and disclosure of her oral communications through the unauthorized accessing of the voice mail capability of a pager not in her possession on another occasion; and (3) a violation of 18 U.S.C. Sec. 2701 by the unauthorized obtaining of electronic communications in electronic storage from Carolina Paging, Inc.
 
 
 11
 The defendants by answer essentially denied that any of the conduct charged to them was unauthorized, and pleaded as affirmative defenses "qualified" and "governmental" immunity, and the statutory "good faith" defenses provided respectively in 18 U.S.C. Secs. 2520(d) and 2707(d). J.A. 71, 72.
 
 
 12
 Following a period of discovery not restricted as to issues, the district court, on joint motion of the parties, entered a consent order that severed for sequential consideration the issues raised by the pleadings. Under the order, two issues identified as potentially dispositive of, or substantially constrictive of, the entire action would be considered first, with all proceedings as to other issues stayed pending decision on the two issues identified. These were, in summary, first and primarily whether the challenged "investigative technique"--the use of "pager clones"--constituted the installation and/or use of a "pen register" or a "trap and trace device" within the meaning of 18 U.S.C. Secs. 2510-21, 3121-27 and N.C.Gen.Stat. Secs. 15A-260-64; and, as a "subsidiary issue," whether the state superior court judge who authorized their use had legal authority to do so. J.A. 93-94. As to these issues, the parties, at the court's invitation, then filed cross-motions for "partial" summary judgment. The cross-motions of course sought directly opposite rulings on the pager clone issues, and seemed, though imprecisely, to agree that those issues concerned only the claim of illegal interception of "electronic communications" in violation of 18 U.S.C. Sec. 2511(1)(a). See J.A. 95-96 (plaintiff's motion); id. 163-65 (defendants' motion). As will appear, the imprecision on this point may have led to confusion down the road in the district court's ruling on the cross-motions.
 
 
 13
 The district court denied plaintiff's motion, granted defendants, and in granting defendants' motion, dismissed the entire "case." J.A. 306-07. In an accompanying memorandum opinion, the court spelled out the critical aspects of its analysis and ruling.
 
 
 14
 On the specific issues, the court held that the defendants' use of the pager clones was effectively the "installation and use of a 'pen register' "[1] that was authorized by 18 U.S.C. Secs. 2510-21, 3121-27, and N.C. Gen.Stat. Secs. 15-A-260 through 264, and that, accordingly, the state court judge who ordered the use "had the legal authority to do so." J.A. 298.
 
 
 15
 Having so ruled on the critical issues, the court, as indicated, then entered a judgment which dismissed the "case." This appeal followed.
 
 II
 
 16
 The dispositive issue is whether the use by officer Waddell of pager clones to receive and record numeric messages being simultaneously received by Brown's leased digital display pagers was, for purposes of relevant law, effectively the use of a "pen register."[2] This is the dispositive issue because if it was effectively the use of a pen register, the use was legally authorized and Brown's claim of illegal interception of an electronic communication (at least) was properly dismissed by the district court.
 
 
 17
 The issue and its implications for this case turn on the meaning of various provisions of the ECPA, 18 U.S.C. Secs. 2510-2521, 3121-3127, and the predecessor "federal wire tap law" which in 1986 the ECPA significantly amended, Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (Title III). So we start with those provisions and something of their background.
 
 
 18
 The principal purpose of the ECPA amendments to Title III was to extend to "electronic communications" the same protections against unauthorized interceptions that Title III had been providing for "oral" and "wire" communications via common carrier transmissions. This extension was found necessary by Congress because of "dramatic changes in new computer and telecommunications technologies" that had created new risks to "privacy and security of communications transmitted by new noncommon carrier communication services or new forms of telecommunications and computer technology." These had not been covered by Title III's protection of "voice communications transmitted via common carrier," and the ECPA amendments were designed to remedy that newly-developed gap in coverage. See United States v. Suarez, 906 F.2d 977, 980 (4th Cir.1990) (quoting and citing relevant legislative history).
 
 
 19
 This was principally accomplished by textual amendments that simply brought "electronic communications" into general parallel with the "wire" and "oral" communications already subject to Title III protection against unauthorized interception, disclosure, or use. See, e.g., 18 U.S.C. Sec. 2511(1)(a). When it came to defining "electronic communication," the amended definitional section did so with a broad, functional description--
 
 
 20
 [E]lectronic communication means any transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photooptical system that affects interstate or foreign commerce,
 
 
 21
 18 U.S.C. Sec. 2510(12), whose scope was then narrowed by excluding several types of communication that fell within the general description, including one of special relevance here: "any communication made through a tone-only paging device." 18 U.S.C. Sec. 2510(12)(c).
 
 
 22
 By these 1986 amendments, authority to intercept electronic communications became subject to the same requirements as those applicable to the interception of oral and wire communications. 18 U.S.C. Sec. 2516.[3] These requirements are stringent, in general paralleling (and in many respects exceeding) constitutional search warrant requirements. See, e.g., 18 U.S.C. Sec. 2516(2) (only "principal" state and local prosecutors may obtain authorization from state court judge); id., Sec. 2518(1) (detailed affidavit requirements for application); id., Sec. 2518(3) (required "probable cause" and necessity determination by issuing judge); id., Sec. 2518(4) (detailed "warrant" requirements); id., Sec. 2518(5) (duration and "minimization" requirements); id. Sec. 2518(8)(a) (recording and sealing requirements).
 
 
 23
 Critically for purpose of this case, interceptions of electronic communications by two specific devices--"pen registers" and "trap and trace devices"--were, however, specifically exempted by the 1986 amendments from these generally applicable authorization requirements. Id. Sec. 2511(b) (use of these devices declared not "unlawful" under provisions of 18 U.S.C. Secs. 2510-21). While unauthorized use of these devices was also prohibited, at peril of criminal and civil penalties, 18 U.S.C. Secs. 3121, 3124(e), the authorization requirements for their use were much less stringent than those generally applicable under 18 U.S.C. Secs. 2516 and 2518 to applications for authority to intercept electronic communications. In particular, unless prohibited by state law, state law enforcement officers (not just principal prosecutors) may obtain authorization for use of these devices from state courts, 18 U.S.C. Sec. 3122(a)(2); the application for authorization to use them need only "certify" that the "information likely to be obtained is relevant to an ongoing criminal investigation" (rather than demonstrating "probable cause"), id. Sec. 3122(b); and the authorization may be given on a mere finding by a competent court that the applicant has made the required certification (rather than only on a "probable cause" determination), id. Sec. 3123(a).[4]
 
 
 24
 As earlier indicated, the authorization obtained for use of the pager clones here in issue was sufficient only if that type device is effectively a "pen register" rather than one whose use is subject to the more stringent authorization requirements of Secs. 2516 and 2518. Hence the dispositive issue on this appeal.
 
 
 25
 On that issue, we are satisfied that under the relevant provisions of the ECPA, the intercepting technique or device authorized and used here--a "clone" or "duplicate" digital display pager--cannot be considered a "pen register."[5]
 
 A "pen register" is defined by statute as
 
 26
 a device which records or decodes electronic or other impulses which identify the numbers dialed or otherwise transmitted on the telephone line to which such device is attached.[6]
 
 
 27
 18 U.S.C. Sec. 3127(3) (emphasis supplied).
 
 
 28
 As a matter of plain textual meaning, a digital display pager clone does not itself fit this definition--in the critical sense that it is not a device attached to a telephone line. It receives (and "intercepts") electronic impulses transmitted by radio waves, and is "attached" to no transmission device. Hence, it is not defined into the category of pen registers by the statutory definition of that device.
 
 
 29
 Neither as a matter of plain textual meaning is it effectively defined out of the category of devices presumptively subject to the stringent authorization requirements of Secs. 2516 and 2518. The type communication it receives fits perfectly into the general definition of the "electronic communications" that are subject to those provisions, for a digital display pager (primary or "clone") unmistakably receives a "transfer of ... signals, ... images, ... data, or intelligence of [some] nature transmitted in whole or part by a ... radio, electromagnetic ... system." 18 U.S.C. Sec. 2510(12). And the type communication it receives is not, as is that received by a "tone-only paging device," specifically exempted by the definitional statute from the protections of these provisions. See id. Sec. 2510(12)(c).
 
 
 30
 So far, therefore, as the literal text of the relevant statutes is concerned, duplicate digital display pagers are not identified as pen registers--either by name or by function. If the statutes be thought nevertheless somehow ambiguous on the point, so that meaning may be sought in legislative history, that history flatly supports what the literal text strongly--if negatively--implies: that cloned digital display pagers were not intended by Congress to be treated as pen registers for purposes of the ECPA.
 
 
 31
 That history makes plain that Congress was well aware that among the new electronic communications devices whose advent led it to enact the ECPA was the pervasive electronic "pager." Three basic types of pager, each with distinctive functions, were identified in the relevant reports.
 
 
 32
 Electronic pagers are radio activated devises (sic) through which a user is notified of another's attempt to contact the carrier of the portable paging unit. These are in wide use among persons who are away from their homes or offices--or, more precisely, away from telephones or two-way radios--yet still need to be reachable by others.
 
 
 33
 Pagers take on one of three basic forms: "tone only," "display" and "tone and voice pagers." The "tone only" device emits a "beep" or other signal to inform the user that a message is waiting, and where that message can be retrieved by the user's making a phone call to a predetermined number (usually an office or answering service). "Display" pagers are equipped with screens that can display visual messages, usually the telephone number of the person seeking to reach the person being paged. The party seeking to make contact with the user is instructed to provide a message, usually by pushing the buttons of a touch-tone telephone; this message is stored by the paging company's computer until it can be transmitted to the user's pager, where the message can then be read directly by the user, obviating the need for the user to make a telephone call to retrieve the message. The most sophisticated type of pager is the "tone and voice" mode. It can receive a spoken message that the paging company's computer has taken from the party seeking to contact the unit's user. After the beep tone is made, the device "repeats" the recorded message. This requires that a radio signal containing voice communications be sent in from the paging company's base to the mobile unit.
 
 
 34
 S.Rep. No. 541, 99th Cong.2d Sess. 9-10 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3563-64.
 
 
 35
 The different functions of the tone-only pager and the digital display pager (in any of its forms) was recognized as warranting completely different treatment in the legislation:
 
 
 36
 Radio communications transmitted over a system provided by a common carrier are not readily accessible to the general public with one exception. That exception is for tone-only paging systems. As a result ..., the interception of tone only paging system transmissions will not be prohibited by [the ECPA]. However, the unauthorized interception of a display paging system, which includes the transmission of alphanumeric characters over the radio, carried by common carrier, is illegal.[7]
 
 
 37
 S.Rep. No. 541, 99th Cong., 2d Sess. 15 (1986), reprinted in 1986 U.S.C.C.A.N. 3555, 3569; see also H.Rep. No. 647, 99th Cong., 2d Sess. 37 (1986).
 
 
 38
 Congress was also aware of the quite different functions, hence different privacy implications, of all types of electronic pagers on one hand as opposed to pen registers and trap and trace devices on the other. The Senate Report treated them in its "Glossary" of terms as entirely different forms of the "new telecommunications" whose advent prompted enactment of the ECPA. In that Glossary, "Pen Registers/Trap and Trace Devices" are defined separately from "Electronic Pagers"--
 
 
 39
 Pen registers are devices that record the telephone numbers to which calls have been placed from a particular telephone. These capture no part of an actual telephone conversation, but merely the electronic switching signals that connect two telephones. The same holds true for trap and trace devices, which record the numbers of telephones from which calls have been placed to a particular telephone.
 
 
 40
 S.Rep. No. 541 at 10, U.S.C.C.A.N. at 3564.
 
 
 41
 The reason for according less protection against interception by pen registers (and trap and trace devices) than by all other forms of intercepting devices not specifically excepted from the ECPA was pointed out in the senate committee report. It was there noted that, as the Supreme Court long since had recognized, see Smith v. Maryland, 442 U.S. 735, 745, 99 S.Ct. 2577, 2582, 61 L.Ed.2d 220 (1979), there are no legitimate expectations of privacy in the telephone numbers one calls, so that no warrant is required by the Fourth Amendment to install a pen register, whose only capability is to intercept those numbers. S.Rep. No. 541, supra, at 2. By contrast, in noting that the function of a digital display pager is "usually" to display telephone numbers, the report implicitly recognized what all parties here concede--that because it can also receive a much larger set of numbers, it can by that means receive and display an unlimited range of number-coded substantive messages.
 
 
 42
 Because of these strong indications from statute and legislative history that interceptions by "cloned" digital display pagers should not be equated with interceptions by pen register, this is the interpretation accepted by the Justice Department's Criminal Division,[8] by commentators,[9] and by the few courts that have addressed the issue directly. See Florida v. Jackson, 650 So.2d 24 (Fla.) (so interpreting the ECPA while interpreting state conforming statutes to require same result); People v. Pons, 133 Misc.2d 1072, 509 N.Y.S.2d 450, 453 (Sup.Ct.1986) ("The monitoring of [a] telephone pager device is more intrusive than the use of a pen register. The pager device is capable of conveying substantive information by combining digits in various sequences. Both telephone numbers and coded messages may be conveyed.")[10]
 
 
 43
 Faced with this diverse array of authority that a duplicate or clone digital display pager is not itself effectively a pen register within contemplation of the ECPA, Waddell advances the novel argument, accepted by the district court, J.A. 301, that the overall "investigative technique" involved should be so considered, because the paging terminal itself functions as a pen register. Specifically, the argument runs, the paging terminal's facilities are attached to a group of telephone lines (those of all callers of subscribing pager numbers) and as to these lines it performs the essential pen register function, as defined in 18 U.S.C. Sec. 3127(3) of "record[ing] or decod[ing] electronic or other impulses which identify the numbers dialed or otherwise transmitted on the telephone line to which the [terminal's] device is attached." On this view of things, the clone pager itself is merely an extension of the terminal-as-pen-register, performing no further function than receiving by radio re-transmission the same numbers already received and recorded by that "pen register." Appellee's Brief at 5-10.
 
 
 44
 The theory is ingenious, and it has some superficially plausible aspects. As the ECPA recognizes, because a paging terminal's recording and decoding functions with respect to telephone numbers dialed on the telephone lines to which it is attached do bring it technically within the statutory definition of a pen register (or trap and trace device), it becomes necessary to except its operation in the regular course of the terminal's business from the ECPA's general prohibitions against unauthorized use of those devices. See 18 U.S.C. Secs. 3121(b); 3127(3).
 
 
 45
 But the theory breaks down precisely on the point that dictates different levels of protection from interception by pen registers (and trap and trace devices) and all other prohibited devices for intercepting electronic communications: the capability of the former to record only outgoing or incoming telephone numbers, of the latter, to record messages with substantive content. Even if "pen register" could, by great interpretive stretch, be deemed to include devices that receive radio re-transmission of numbers first received, recorded and de-coded by a true pen register (a device attached to a telephone line), the numbers capable of being so re-transmitted surely would have to be limited to raw telephone numbers to retain pen register status. That, as has been indicated, does not describe the capability of a duplicate digital display pager functioning in conjunction with a paging terminal in the manner demonstrated in this case. Where, as here, a caller dials a telephone number assigned to a digital display pager, the paging terminal receives that number via telephone line, records and identifies it as one assigned to one of its subscribers (so far, a classic pen register function in relation to the caller's line), then transmits a "prompt" to the caller to enter the caller's number. The caller may at this point, and usually does, enter only a telephone number which is transmitted to the terminal for recording (a classic trap and trace function in relation to the caller's line), followed by re-transmission to the digital display pager of a subscriber, ordinarily for the purpose of prompting a return call of that number by the subscriber. See J.A. 210-21. But, as has been indicated, it is undisputed that in response to the terminal's prompt, a caller may dial to the terminal and the terminal dutifully will re-transmit by radio to its subscriber's digital display pager, a greater set (here 24 or 25) of numbers and by this means convey coded messages of unlimited substantive content.[11]
 
 
 46
 We therefore hold that the "investigative technique" of using a duplicate, or clone, digital display pager to intercept numeric transmissions intended for a suspect's digital display pager cannot be considered the use of a "pen register" within the meaning of the ECPA. The district court's contrary holding and consequent dismissal of Brown's electronic communication claim by summary judgment was therefore in error. The judgment must therefore be vacated and the action remanded for further proceedings. As a matter of law, use of the pager clones to intercept numeric transmissions to Brown's digital display pagers was an unauthorized interception of "electronic communications" under 18 U.S.C. Sec. 2511.
 
 III
 
 47
 As indicated in Part I of our opinion, although the defendant appellees' motion for summary judgment only sought dismissal of, and the district court's opinion only addressed, plaintiff-appellant's first claim for relief (unauthorized interception of "electronic communications"), the court's judgment dismissed the entire action ("case"). The court's memorandum opinion did not, however, so far as we can tell, address or give reasons for the dismissal of either the claim of unauthorized obtaining of electronic communications in storage in violation of 18 U.S.C. Sec. 2701 or the claim of unauthorized interception of "oral communications" in violation of 18 U.S.C. Sec. 2511. Upon the remand we will order, the court must address all the claims pleaded.
 
 
 48
 As to the claim of unauthorized interception of "electronic communications" in violation of 18 U.S.C. Sec. 2511, our holding that the interception was unauthorized entitles Brown to appropriate relief as prayed unless defendants-appellees establish entitlement to any of the "immunity" or "good faith" defenses pleaded. As to the merits of those defenses, we express no opinion.
 
 
 49
 Neither do we express any opinion on the merits of the so far unaddressed claims of unauthorized interception of "oral communications" in violation of 18 U.S.C. Sec. 2511, or of unauthorized obtaining of electronic communications in storage in violation of 18 U.S.C. Sec. 2701; or of any affirmative defenses to either of those claims.
 
 
 50
 VACATED AND REMANDED FOR FURTHER PROCEEDINGS.
 
 
 
 [1]
 Though the court's memorandum opinion identified the specific issue as being whether "the investigative technique ... constitute[d] the installation and/or use of a 'pen register' or a 'trap and trace device,' the ensuing analysis was confined to identifying it as a 'pen register.' " J.A. 300-03. The judgment then entered, however, recited a conclusion that "the investigative technique employed by the defendants ... was a 'pen register' or 'trap and trace' device within the meaning of the law." J.A. 306
 
 
 [2]
 Although the appellees formally identify the issue on appeal as whether the "investigative technique" involving use of pager clones constituted the installation and use of a "pen register" or a "trap and trace device," their specific arguments in brief are then confined to demonstrating that it constituted the use of a "pen register." Appellees' Brief 1-4. The "technique" was so identified in the state judge's authorization order, J.A. 147-48, and this was the basis upon which it was found authorized by the district judge in his memorandum opinion. See note 1, supra. We therefore consider that the only issue properly presented for consideration on this appeal is whether the challenged pager clone "investigative technique" was effectively the installation and use of a "pen register." See Fed.R.App.P. 28(a)(5), (6)
 
 
 [3]
 Subject to a delayed effective date with respect to state court authorizations to intercept. The ECPA gave the states a grace period of two years within which they might make conforming amendments to their laws governing interceptions of electronic communications by state officials. During that period or until conforming amendments were earlier made, extant state law was allowed to remain in effect. At the end of two years, if no such amendments had been made, the federal law took effect and prohibited interceptions of electronic communications except by federal authorization. See Suarez, 906 F.2d at 980-81. North Carolina did not enact the required laws during the grace period, see id. at 983, which expired on October 21, 1988, well before the state court authorization here in issue
 
 
 [4]
 As it did with respect to state court authorizations for interceptions under Secs. 2516, 2518, the ECPA provided a delayed effective date, following a grace period, for states to enact conforming statutes respecting the installation and use of these devices. North Carolina did not enact the required law within the grace period, see Suarez, 906 F.2d at 983 n. 12, well before the authorization here in issue
 
 
 [5]
 To conclude so on this primary issue is necessarily also to conclude on the "subsidiary" issue--whether the state judge had authority to issue the challenged order--that he did not. At the time it was issued, North Carolina state judges had no power under superseding federal law to authorize the interception of electronic communications by any means except pen registers or trap and trace devices. See supra notes 3 and 4. If use of the pager clone was not effectively the use of a "pen register," the judge then had no power to authorize its use
 
 
 [6]
 The definition then excepts from the statute's coverage (by saying "the term does not include")
 any device used by a provider or customer of a wire or electronic communications service for billing, or recording as an incident to billing, for communications services provided by such provider or any device used by a provider or customer of a wire communication service for cost accounting or other like purposes in the ordinary course of its business.
 
 
 [7]
 Appellees seek to avoid the force of this passage by pointing out that it refers only to the "transmission of alphanumeric (letters and digits) characters," whereas the intercepted transmissions here in issue were only of "numeric" characters. There is no merit to this. The reference to this distinguishing characteristic of transmissions to display pagers is inclusive rather than exclusive, and obviously contemplates numeric transmissions as well. The two share the distinguishing characteristic that differentiates them from the tone-only pager: they can receive messages having substantive content, which is the point being made in this passage
 
 
 [8]
 In commenting on the practical implications of the ECPA's addition of electronic communications to those now protected by Secs. 2516 and 2518, the Department's 1991 Electronic Surveillance Manual (Vol. I) advised that
 The types of electronic communications that are most commonly the subject of Title III [Sec. 2516-18] applications are those occurring over digital display paging devices and facsimile (fax) machines. Interceptions over these devices is usually accomplished through the use of duplicate or "clone" pagers and fax machines, and applications for this type of interception must comply with the requirements set forth in Sec. 2518.
 J.A. 99.
 Appellees rightly point out that this Manual does not have the force of law and that the Department expressly disclaims any such force. It serves, however, as persuasive interpretative guidance by an agency charged with enforcement of the ECPA provisions to which it refers.
 
 
 [9]
 See R. Fiatal, The Electronic Communications Privacy Act, Pts. I-III, 57 FBI Law Enforcement Bulletin, Nos. 2-4, February-April, 1988, pp. 16, 28
 
 
 [10]
 Appellees, conceding that they deal only "obliquely" with the dispositive issue, cite in support of their position several cases. The cases do indeed only touch obliquely upon the issue, largely reflecting only a degree of early uncertainty on the part of both law enforcement officers and courts about the protections newly accorded electronic communications by the 1986 ECPA amendments. None, upon analysis, provides actual support for appellee's position. In our Suarez case, for example, although a pager clone was authorized on an application for a pen register, the parties agreed that Sec. 2518 governed the interception that ensued, 906 F.2d at 980 n. 7, and contended only over application of its recording and sealing requirement. Id. at 983-84. Similarly, United States v. Tutino, 883 F.2d 1125 (2d Cir.1989), which contained the comment that because "duplicate paging devices reveal only numbers, not the content of conversations [and][i]n this way ... are similar to pen registers," id. at 1141, actually only decided that Sec. 2518's minimization requirements, which presumably were thought to govern, could not be applied to pager clones (our limited holding in Suarez ). Finally, in United States v. Meriwether, 917 F.2d 955 (6th Cir.1990), in which appears the observation that "a digital display pager, by its very nature is nothing more than a contemporary receptacle for telephone numbers," (sic), id. at 958, the court actually decided only that the seizure of such a pager and numbers being displayed on it pursuant to a valid search warrant did not violate the Fourth Amendment
 
 
 [11]
 That a digital display pager programmed to receive numeric transmissions has the capability to receive by that means coded substantive messages--whether or not it happens to do so during a particular period of interception by clone pager--is what makes the interception subject to the authorization requirements of Secs. 2516 and 2518. That the interceptions made in this case did include some such coded messages is relevant only in demonstrating the capability, not in determining whether the interception was legally authorized